**United States District Court for the District of Columbia**

**United States of America**          \*

    **v.**          \*          **No. 1:23-cr-00190-ABJ-4**

**Gause, et al.**          \*
    **[Floyd Neal]**

**Defendant Floyd Neal's Sentencing Memorandum, Motion for Concurrent Sentence and to Designate the Virginia Department of Corrections as a Bureau of Prisons Facility for the Purpose of this Sentence, Motion for Credit, and Request for Recommendations to Bureau of Prisons**

Table of Contents

Sentencing Memorandum ............................................................................................ 1

Motion for Concurrent Sentence and to Designate the Virginia Department of
   Corrections as a Bureau of Prisons Facility for the Purpose of this Sentence ...... 21

Motion for Credit ....................................................................................................... 22

Request for Recommendations ................................................................................... 23

Points and Authorities ............................................................................................... 23

Certificate of Service ................................................................................................. 25

Appendix ............................................................................................................. App'x

**Sentencing Memorandum**

Introduction

Floyd is the youngest of seven children.  Doc. 73 at ¶ 100.  He has five sisters, a brother, and a cousin.  App'x at 2.

Floyd's mom Ella Mae Neal was "the backbone" of the family, and anyone who needed a place to stay was welcome.  Id.  Ella Mae, Floyd, his sister Lakisha,

cousin Tonya, Ella Mae's parents, and six other relatives lived in a 1,560 square foot house built in 1915 on 4th Street in Northeast D.C.  App'x at 2, 4.  It had three bedrooms and two bathrooms.  App'x at 2  The family received Section 8 housing assistance and food stamps.  Id.  Floyd's father Floyd Glover lived nearby and worked as a special police officer.  Id.; Doc. 73 at ¶ 97.

The home on 4th Street was in between Edgewood and Eckington.  App'x at 4. Throughout the 1990s, Ward 5 was a place where drug distribution, prostitution, homicides, and violent crime were rampant.  Id.  Floyd regularly heard about neighborhood shootings, and often he heard gunfire outside his house.  Id.  He also saw drug deals and other crimes happening just outside his house.  Id.  He knew that his brother Larry was in prison because of getting caught up in it.  Id.

Floyd was in special education classes in D.C. Public Schools for "deficits in all academic areas, as well as in verbal and performance skills[]" and an IQ of 71. App'x at 7; Doc. 73 at ¶ 117.  An IQ below 70 is defined as Intellectual Disability (formerly mental retardation).  App'x at 7.  An IQ of 71 to 84 is considered borderline intellectual functioning.  Id.

Larry and Lakisha recall Floyd's serious anger as a child.  App'x. at 5.  He was easily frustrated and hard to placate.  Id.  Floyd remembers he would yell a lot. Id.

When Floyd was nine, his brother Larry returned from serving four years in Prince William County, Virginia for possession of cocaine and violations of

probation.  App'x. at 2.  Floyd looked up to Larry, who was twenty-seven.  Id.  Larry was a "hustler," who spent a lot of time on the streets, drinking and smoking marijuana with friends.  Id.

In May 2001, Floyd's special education services were increased to 16 hours per week to address "global deficiencies in all areas of academics and communication."  App'x. at 7.

When Floyd was 11, he and his sisters were placed in foster care after Tonya's infant daughter suffocated and died.  App'x at 2; Doc. 73 at ¶ 99.  Tonya was 15 years old.  App'x at 2.  Floyd recalls his foster parents were decent people, who had an adopted son much younger than he.  Id.

Over the next two years, Floyd attended school regularly and had weekly visits with his mother and sisters.  App'x at 2, 4.  In May 2004, a cognitive/adaptive behavior specialist noted Floyd had deficits in non-verbal skills, word knowledge, and "overall seems in the borderline range of functioning."  App'x. at 7.

After D.C. authorities closed their investigation, Ella Mae, Floyd, Lakisha, and Tonya were reunited.  App'x at 2, 4; Doc. 73 at ¶ 99.  Ella Mae moved the family to 4206 Edson Place, a 1,200 square foot house in Northeast, D.C., and for the first time, Floyd had his own bedroom.  App'x at 2, 4.  Although his grandfather had died, and his grandmother had moved to her own apartment; an aunt, uncle and four cousins continued to live with the Neals.  App'x at 2.

The home on Edson Place was in Deanwood/Lincoln Heights, another area known for high crime rates. App'x at 4. When Floyd lived there from 2005 until 2012, violent crime in Ward 7's 6th police district was the highest or second highest in the Ward. Id. Ward 7 had the second highest homicide rate in the city from 2005 to 2010 and in 2012. Id. In 2011, it had the highest. Id.

In 2005, Floyd was referred to Accotink Academy Therapeutic Day School in Springfield, Virginia, because of the extent of his disabilities. App'x. at 7. Accotink Academy is a special needs school, serving students aged six to twenty one, who have emotional, developmental and acute learning disabilities in reading, mathematics and written expression. Id. Although Floyd was in 6th grade, he was below average in overall language and oral expression, and he needed extra time processing information. Id. He maintained "significant deficits" in reading and spelling, such that graduating tests could not be administered. Id. His reading was at a first to second grade level, and his working memory was in the borderline range. Id. It was recommended that Floyd have all academic learning in a special education setting, and that Floyd's language services be increased from one to five 30-minute sessions weekly. Id.

Although Floyd was cooperative and polite with his teachers and administrators, he had trouble following directions and was displaying difficulty regulating his emotions and expressing his feelings. Id. He was also beginning to seek attention in inappropriate ways and had difficulty interacting with peers. App'x. at 7−8. He began attending group counseling sessions focused on behavior

self-management.  App'x. at 8.  In July 2005, Floyd was approved for Extended

School Year services.  Id.

Floyd continued receiving special education services throughout the summer

and returned to the D.C. Public Schools in the fall, enrolling in 7th grade at Kelly

Miller Middle School.  Id.  Floyd remembers getting into fights with classmates, and

one time he was suspended for it.  App'x. at 5.  He began smoking marijuana.

App'x. at 6.  Over two-years, he passed only two self-contained math classes and one

self-contained English class.  App'x. at 8.  Still, he was promoted to H.D. Woodson

High School in 2007.  Id.

As a teenager, Floyd had episodes of paranoia.  App'x. at 5.  Sometimes the

feeling that people were watching him could last for hours or days.  Id.

When Floyd attended Woodson, 80% of the student population was

considered "at risk," and the building was in complete disrepair.  App'x. at 8.  It was

demolished a year after he left.  Id.  He received four Fs and two Ds, and he was

expelled before the end of the year for setting fire to a bathroom trashcan.  Id.  He

was hoping the fire would cause school to close early so he could go home.  Id.

He then attended Spingarn High School, where he failed all classes.  Id.  He

repeated ninth grade and failed all but one class.  Id.  He was placed in a program

called Pathways to Success in Special Education, designed for students "whose

severity of disability requires a focus on independent life skills and career

readiness."  Id.

Around age 16, Floyd was diagnosed with Bi-Polar, Schizophrenia, and Mood Disorders.  Doc. 73 at ¶ 111.

### Bipolar Disorder

Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks.  National Institute of Mental Health, https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (Retrieved June 13, 2024).  There are four basic types of bipolar disorder, all of which involve clear changes in mood, energy, and activity levels.  Id.  These moods range from periods of extremely "up," elated, and energized behavior (known as manic episodes) to very sad, "down," or hopeless periods (known as depressive episodes).  Id.  Less severe manic periods are known as hypomanic episodes.  Id.

### Schizophrenia

Schizophrenia is a serious mental disorder that affects how a person thinks, feels, and behaves.  National Institute of Mental Health, https://www.nimh.nih.gov/health/publications/schizophrenia/index.shtml (Retrieved June 13, 2024).

People with schizophrenia might seem like they have lost touch with reality. Id.  They might hear voices other people do not.  Id.  They might think other people are trying to hurt them.  Id.  Sometimes they do not make any sense when they talk.  Id.

Schizophrenia occurs in slightly more men than women and affects all ethnic groups.  Id.  Symptoms usually start between the ages of 16 and 30.  Id.  In rare cases, children have schizophrenia too.  Id.  Schizophrenia symptoms fall into three categories: positive, negative, and cognitive.  Id.

"Positive" symptoms are psychotic experiences that are not generally seen in healthy people.  Id.  People with these symptoms are sometimes unable to tell what is real from what is imagined.  Id.  These symptoms can be severe, and at other times, hardly noticeable.  Id.  Positive symptoms include:

o   Hallucinations: when a person sees, hears, smells, tastes, or feels things that are not real.  "Hearing voices" is common for people with schizophrenia.  People who hear voices may hear them for a long time before family or friends notice a problem.

o   Delusions: when a person believes things that are not true.  For example, a person may believe that people on the radio and television are talking directly to him or her.  Sometimes people believe that they are in danger and others are trying to hurt them.

o   Thought disorders: when a person has ways of thinking that are odd or illogical.  People with thought disorders may have trouble organizing their thoughts.  Sometimes a person will stop talking in the middle of a thought or make up words that have no meaning.

o   Movement disorders: when a person has what appear as agitated body movements.  A person may repeat certain motions over and over.  In the

7

other extreme, a person may stop moving or talking for a while, which is a rare condition called *catatonia.*

https://www.nimh.nih.gov/health/publications/schizophrenia/index.shtml (Retrieved June 13, 2024).

"Negative" symptoms refer to social withdrawal, difficulty showing emotions, or difficulty functioning normally.  Id.  People with negative symptoms may need help with everyday tasks.  Id.  Negative symptoms include:

- o  Talking in a dull voice
- o  Showing no facial expression, such as a smile or frown
- o  Having trouble experiencing happiness
- o  Having trouble planning and sticking with an activity, such as grocery shopping
- o  Talking very little to other people, even when it is important

Id.

Cognitive symptoms are not easy to see, but they can make it hard for people to have a job or take care of themselves.  Id.  Often, these symptoms are detected only when specific tests are performed.  Id.  Cognitive symptoms include:

- o  Difficulty using information to make decisions
- o  Problems using information immediately after learning it
- o  Trouble paying attention

https://www.nimh.nih.gov/health/publications/schizophrenia/index.shtml (Retrieved June 13, 2024).

Many factors can cause schizophrenia, including:

o   Genes, because schizophrenia sometimes runs in families.  However, it is
    important to know that just because someone in a family has schizophrenia,
    it does not mean other members of the family will have it as well.

o   The environment, such as exposure to viruses or nutrition problems before
    birth

o   Brain structures and brain chemistry

Id.  Scientists have learned a lot about schizophrenia, but more research is needed
to help explain its causes.  Id.

Antipsychotic medications and psychosocial treatments can help with
symptoms.  Id.  Antipsychotic medications help patients with the psychotic
symptoms of schizophrenia, but the medications have side effects for some people.
Id.  People respond to antipsychotic medications differently.  Id.  Sometimes a
person must try several medications before finding the right one.  Id.  People should
not stop taking a medication without first talking to a doctor.  Id.  Stopping
medication suddenly can be dangerous, and it can make schizophrenia symptoms
worse.  Id.

Psychosocial treatments help patients deal with everyday challenges of
schizophrenia.
https://www.nimh.nih.gov/health/publications/schizophrenia/index.shtml (Retrieved
June 13, 2024).  These treatments are often most helpful after patients find a
medication that works.  Id.

Most people with schizophrenia are not violent.  Id.  However, the risk of violence is greatest when schizophrenia is untreated.  Id.  It is important to help a person with schizophrenia symptoms get treatment as quickly as possible.  Id. People with schizophrenia are much more likely to harm themselves than others. Id.

It is common for people with schizophrenia to have problems with drugs and alcohol.  Id.  A treatment program that addresses both illnesses is critical for recovery because drug and alcohol abuse can interfere with treatment for schizophrenia.  Id.  Drug abuse can increase the risk of suicide, trauma, and homelessness in people with schizophrenia as well as the risk of developing other mental illnesses.  Id.

*Mood Disorder*

Mood disorder is a category of mental illnesses in which the underlying problem primarily affects a person's persistent emotional state (mood). https://www.nimh.nih.gov/health/statistics/any-mood-disorder (Retrieved June 13, 2024). These disorders can be found on the NIMH Health Topic pages on depression, bipolar disorder and seasonal affective disorder.

*Additional Social History*

At 16, Floyd began lacing marijuana with PCP, smoking ten or more dippers daily for a couple of years.  App'x. at 6; Doc. 73 at ¶ 115.  At 18, he stopped smoking dippers, because he felt PCP had "messed up his head."  App'x. at 6.  He continued

smoking marijuana "from morning until night," and he began drinking.  App'x. at 6; Doc. 73 at ¶ 115.

In 2011, Floyd worked for the D.C. Department of Public Works for a year. Doc. 73 at ¶ 122.  He also began dating Kiante Hamilton.  App'x at 10.  They were together for about two years and have a 12-year-old daughter K.H.  Id; Doc. 73 at ¶ 102.

In 2011 or 2012, Floyd was treated at Washington Hospital Center overnight after being stabbed in the back and legs while fighting.  Doc. 73 at ¶ 108.

He passed two functional living skills classes, a self-contained math class, a small group writing class, and band, receiving a Special Education Certificate and Flagger Certificate in 2012.  App'x. at 8; Doc. 73 at ¶ 117.

Floyd characterized his childhood as "good."  Doc. 73 at ¶ 99.

After completing his education in 2012, Floyd remained at home and spent most of his time smoking marijuana and drinking.  App'x. at 3.  He worked as a food server, until he was laid off.  Doc. 73 at ¶ 120.  He also worked temporary jobs in construction.  Doc. 73 at ¶ 121.  Soon, he was arrested for assaulting a girlfriend and sentenced to probation.  App'x. at 3.  Drug use violated his probation, and in April 2013, he was sentenced to 180 days in D.C. Jail.  Id.

In June of 2013, Floyd was arrested for offenses committed in 2011.  Id.  He pled guilty to armed robbery and carrying a dangerous weapon and was sentenced to 60 months.  Id.  In the meantime, Ella married Charles Allgood, and the couple

was residing in an apartment on Q Street in Southeast, D.C.  Id.; Doc. 73 at ¶ 97.

When Floyd was released from F.C.C. Butner, North Carolina, he moved in with

them.  App'x at 3.

Floyd was hospitalized on April 8, 2018, after driving his car into a telephone

pole.  App'x at 10.  Sedatives were administered to complete the exam, because

Floyd was agitated and somewhat combative.  Id.  Blood tests found no alcohol.  Id.

Floyd was discharged after about eight hours.  Id.  Floyd said he suffered from "a

bad headache" for a couple of weeks after the accident.  Id.  He has a scar on his

forehead from the crash.  Doc. 73 at ¶ 107.

Floyd was also hospitalized on December 19, 2018, for an opioid overdose.

App'x at 6.  He had stopped breathing, and someone had called 9-1-1.  Id.

Emergency responders administered Narcan, and Floyd responded.  Id.  He told the

emergency room physician he had been drinking and denied using heroin or other

opioids.  Id.  After two hours, he was released.  Id.

In 2019, Floyd married Myesha Inman.  Doc. 73 at ¶ 102.  They are separated

and seeking a divorce.  Id.

In 2019, Floyd was also diagnosed with bipolar disorder (*supra* at 6),

depression, substance use disorder, and post-traumatic stress disorder.  App'x at 5.

### *Depression*

While everyone feels sad or low sometimes, these feelings usually pass with a

little time.  National Institute of Mental Health,

https://www.nimh.nih.gov/health/publications/depression/index.shtml (Retrieved Apr. 11, 2024).  However, depression—also called "clinical depression" or "depressive disorder"—is a mood disorder that causes distressing symptoms that affect how you feel, think, and handle daily activities, such as sleeping, eating, or working.  To be diagnosed with depression, symptoms must be present most of the day, nearly every day for at least two weeks.  Id.

### Substance Use Disorder

Drug use and mental health problems often happen together.  National Institute of Mental Health, https://www.nimh.nih.gov/health/topics/substance-use-and-mental-health (Retrieved Apr. 11, 2024).  Many people who have drug problems also have mental health problems.  Id.  Examples include anxiety disorders, depression, attention-deficit hyperactivity disorder (ADHD), bipolar disorder, personality disorders, and schizophrenia.  Id.

### Post-Traumatic Stress Disorder

Post-traumatic stress disorder (PTSD) is a disorder that develops in some people who have experienced a shocking, scary, or dangerous event. https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd (Retrieved June 13, 2024).

It is natural to feel afraid during and after a traumatic situation.  Id.  Fear is a part of the body's "fight-or-flight" response, which helps avoid or respond to potential danger.  Id.  People may experience a range of reactions after trauma, and

most recover from initial symptoms over time.  Id.  People, who continue to experience problems, may be diagnosed with PTSD.  Id.

Anyone can develop PTSD, including combat veterans and people who have experienced or witnessed a physical or sexual assault, abuse, an accident, a disaster, or other serious events.  Id.  People who have PTSD might feel stressed or frightened, even when they are not in danger.  Id.

Not everyone with PTSD has been through a dangerous event.  Id. Sometimes, learning that a friend or family member experienced trauma can cause PTSD.  Id.

*Additional Social History*

Floyd was prescribed anti-depressants and a mood stabilizer.  Id.  He was referred to Neighbors' Consejo, a non-profit mental health organization.  Id.; Doc. 73 at ¶ 112.  A psychiatrist also administered two tests.  App'x at 8.  Floyd scored "Well Below Average" on the Verbal Skills test (1st percentile) and on the Math Skills test (2nd percentile - below 3rd grade level).  Id.

In August of 2020, Floyd's father died from a massive heart attack.  App'x at 10; Doc. 73 at ¶ 97.  He was 69 years old.  App'x at 10.

On April 1, 2021, Floyd was arrested in Prince William County, Virginia. App'x at 3; Doc. 73 at ¶ 82.  He pled guilty in Circuit Court to Robbery and Abduction for the same conduct that he is pending sentencing here for Count 15.  Id.

He is currently serving a sentence of 30 years suspend all but 10 years' imprisonment, followed by 10 years' probation in Virginia.  Id.

A month after Floyd's arrest, Floyd's mother was shot and killed outside her home.  App'x at 3; Doc. 73 at ¶ 97.  She was the unintended target of a drive-by shooting.  App'x at 3.  She was 65 years old.  Id.  No suspects have been identified. Id.  Floyd and Lakisha speculate that a cousin who was living with them at the time and selling drugs, might have been the intended target.  Id.

Floyd and his current girlfriend Jasmine Dolberry have a two-year old daughter K.N.  App'x at 10; Doc. 73 at ¶ 103.  K.N. is two and was born since he has been incarcerated.  Id.

Floyd told Alexandria Detention Center staff he believed the medications he was prescribed while with CSOSA helped him stay calm, but he eventually stopped taking them and self-medicated with marijuana.  App'x at 6.  In July 2023, a psychologist noted Floyd was anxious and appeared mildly depressed.  Id.  Floyd was prescribed the anti-depressant, Mirtazapine and the anti-psychotic, Olanzapine.  Id.  Later Trazodone added was added.  Id.

In August, Floyd was formally evaluated, and his diagnosis was changed to Major Depressive Disorder (*supra* at 12).  App'x at 6.

Floyd was not exhibiting symptoms of psychosis or mania, so the treatment protocol was continued.  Id.  In October, Floyd reported feeling less depressed but continued having trouble sleeping.  Id.  His dose of Trazodone was increased.  Id.

15

During a December assessment, Floyd reported improved sleep with the higher dose of Trazodone.  Id.  He has been reassessed every four to six weeks since and has remained stable.  Id.

Currently, Floyd is participating in therapy and believes he would benefit from continued treatment.  Doc. 73 at ¶ 111.  He would like to be a partner with Jasmine and a father to his children.

Considering:

1.      Floyd's intellectual impairment;

2.      His mental illness;

3.      His struggled with drug addiction;

4.      His commitment to treatment;

5.      That he is currently serving a sentence of 30 years suspend all but 10 years' imprisonment, followed by 10 years' probation in Virginia for the same conduct that he is pending sentencing here for Count 15 (App'x at 3; Doc. 73 at ¶ 82);

6.      That he has two minor children; and

for such other reasons as might be raised during the sentencing hearing, 157 months of incarceration, followed by three years of supervised release with credit for time served in custody since April 1, 2021, running concurrently with the sentences for CR21001178-00 and CR21001179-00 in the Circuit Court for Prince William County, Virginia is sufficient, but not greater than necessary to comply with the purposes of the law.

16

Application of the Statutory Sentencing Factors to the Facts of this Case

Pursuant to Title 18, United States Code, Section 3553(a), the Court must consider the following factors when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant:

(a)      Nature and Circumstances of Offense:

Floyd Neal pled guilty to three counts of Hobbs Act robbery (18 U.S.C. § 1951(a)) and possessing a firearm while drug trafficking (18 U.S.C. § 924(c)).

(b)      History and Characteristics of Floyd Neal:

*See supra* at 1–16.

2.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives:

(A)      To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;

While there is legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law, if the law is merely a means to dispense harsh punishment without considering the real conduct and circumstances involved, then the law promotes derision instead of respect. *Gall v. United States*, 128 S. Ct. 586, 600 (2007).

Likewise, ignoring the persistence of *de facto* disparities because of color, religion, national origin, or ethnic discrimination, and the persistence of law enforcement practices relying to any degree on these factors as the basis for

criminal suspicion and investigation promotes derision instead of respect.  *See* The
Persistence of Racial and Ethnic Profiling in the United States,

https://www.aclu.org/files/pdfs/humanrights/cerd_finalreport.pdf (Retrieved June

14, 2024); *see also* The Racial History of Criminal Justice in America,

https://www.cambridge.org/core/journals/du-bois-review-social-science-research-on-
race/article/abs/racial-history-of-criminal-justice-in-
america/2DFFEFC01435BB148B6983FFB276D145 (Retrieved June 14, 2024);

Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government
Segregated America*, Liveright, May 2017.

Eventually, people who are persistently suspected of crime and investigated
based on their color, religion, national origin, or ethnicity—regardless of what they
do—might think the law promotes derision instead of respect.

In addition, people who are privileged to be immune from suspicion of crime
based on their favored color, religion, national origin, or ethnicity and who avoid
ever being investigated regardless of what they do might think the law does not
apply to them.  Likewise, this promotes derision instead of respect for the law.

> (B)     To afford adequate deterrence to criminal conduct;

Persistent discrimination and privilege would likely erode any deterrent
effect too.  If people believe that they will be punished no matter what, or that the
law does not apply to them at all, then they would have no reason to pay it any
mind.

18

(C)     To protect the public from further crimes of the
         defendant; and

(D)     To provide the defendant with needed educational or
         vocational training, medical care, or other correctional
         treatment in the most effective manner;

3.     The Kinds of Sentences Available

The Supreme Court severed and excised Title 18, United States Code, Section

3553(b), the portion of the federal sentencing statute that made it mandatory for

courts to sentence within a particular Sentencing Guidelines range.  *United States*

*v. Booker*, 125 S. Ct. 738, 756 (2005).  This renders the Sentencing Guidelines

advisory.  *Id.*  Title 18, United States Code, Sections 924(c)(1)(A)(i), 1951(a), 3551,

3559, 3561, 3571, 3581, and 3583 specify what types of sentences may be imposed.


Counts 11, 13, and 14

Section 1951(a) provides for imprisonment, which may not be more than

twenty years, a fine, or both.  The maximum fine is $250,000. 18 U.S.C. §

3571(b)(3).  Section 3583(b)(2) provides for not more than three years of supervised

release.


Count 15

Section 924(c)(1)(A)(i) provides for imprisonment from five years to life.  The

maximum fine is $250,000. 18 U.S.C. § 3571(b)(3).  Section 3583(b)(1) provides for

not more than five years of supervised release.

4.      The Kinds of Sentence and the Sentencing Range Established by
        the Sentencing Commission

Mr. Neal does not object to the Presentence Report filed May 23, 2024.  Doc.

73.


Fine

The Court does not have to impose a fine, when the defendant demonstrates

inability to pay and is not likely to become able to pay any fine.  U.S.S.G. § 5E1.2(a).

The fine range would be from $25,000.00 to $250,000.00.  U.S.S.G. § 5E1.2(c)(3), (4).

However, Floyd Neal is: i) indigent (Doc. 2), ii) incarcerated, iii) the father of minor

child, and iv) the Presentence Report indicates that he appears unable to pay a fine.

Doc. 73 at ¶ 128.  Accordingly, Floyd Neal requests that the Court waive the

imposition of a fine.  U.S.S.G. § 5E1.2(e).


5.      Any Pertinent Policy Statement

Policy Statements regarding Mental and Emotional Conditions (U.S.S.G. §

5H1.3) and Physical Condition, Including Drug or Alcohol Dependence or Abuse;

Gambling Addiction (U.S.S.G. § 5H1.4) might be relevant.


6.      The Need to Avoid Unwarranted Disparities

Although the Guidelines were intended to reduce unwarranted sentencing

disparity across the country between similarly situated defendants, there are some

guidelines which, as the Sentencing Commission itself has noted, increase disparity.

For example, despite the Fair Sentencing Act, cocaine base continues to be punished 18 times more severely than powder cocaine.

     7.    The Need to Provide Restitution to Any Victims of the Offense

Mr. Neal has no information.

## Motion for Concurrent Sentence and to Designate the Virginia Department of Corrections as a Bureau of Prisons Facility for the Purpose of this Sentence

Defendant Floyd Neal moves: i) for this sentence to run concurrently with the sentences for CR21001178-00 and CR21001179-00 in the Circuit Court for Prince William County, Virginia and ii) to designate the Virginia Department of Corrections as a Bureau of Prisons facility for the purpose of serving this sentence. 18 U.S.C. § 3621(b)(4)(B); *see United States v. Hardesty*, 958 F.2d 910 (9th Cir. 1992); B.o.P., Program Statement P5160.05: Designation of State Institution for Service of Federal Sentence (Jan. 16, 2003), available at https://www.bop.gov/policy/progstat/5160_005.pdf (Retrieved June 14, 2024). In support,

     1.    Neal is currently serving a sentence of 30 years suspend all but 10 years' imprisonment, followed by 10 years' probation in Virginia for the same conduct that he is pending sentencing here for Count 15. App'x at 3; Doc. 73 at ¶ 82.

2.    His appearance for these proceedings has been by Writ of Habeas Corpus ad Prosequendum.  Doc. 19.

3.    Absent the federal court expressly ordering the federal sentence to run concurrently, the B.o.P. will treat the federal sentence as running consecutively to any undischarged term of imprisonment.  *See* 18 U.S.C. § 3585(b).

4.    The Court may make its intent clear by using language on the Judgment such as "Said sentence to run concurrently with any other sentence presently being served."

## Motion for Credit

Defendant Floyd Neal moves for credit for time already served in custody since April 1, 2022.  In support,

1.    Neal was arrested on April 1, 2022, for the same conduct that he is pending sentencing here for Count 15.  App'x at 3; Doc. 73 at ¶ 82.

2.    The Court ordered commitment.  Min. Ent. July 27, 2023.

3.    Neal has spent time in official detention prior to the date this sentence commences—(1) as a result of the offense for which the sentence will be imposed; or (2) as a result of any other charge for which he was arrested after the commission of the offense for which this sentence will be imposed.  18 U.S.C. § 3585(b); B.o.P. Policy Statement 5880.28.

4.      The sentence Neal is currently serving in Virginia is for the same conduct that he is pending sentencing here for Count 15.  App'x at 3; Doc. 73 at ¶ 82.

## Request for Recommendations to the Bureau of Prisons

Defendant Floyd Neal requests that the Court recommend to the Bureau of Prisons:

1.      "Said sentence to run concurrently with any other sentence presently being served;"

2.      Designation of the Virginia Department of Corrections as a Bureau of Prisons Facility for the Purpose of this Sentence;

3.      Upon the expiration of active incarceration by Virginia, designation to F.M.C. Butner, for the balance of Neal's federal imprisonment;

4.      credit for time served in state custody pursuant to Section 3585(b);

5.      participation in the R.D.A.P. program; and

6.      release to a community corrections facility or to home monitoring as soon as possible.

## Points and Authorities

*Gall v. United States*, 128 S. Ct. 586 (2007).
*United States v. Booker*, 125 S. Ct. 738 (2005).
*United States v. Hardesty*, 958 F.2d 910 (9th Cir. 1992).

18 U.S.C. § 924(c).

18 U.S.C. § 1951(a).

18 U.S.C. § 3551.

18 U.S.C. § 3553.

18 U.S.C. § 3559.

18 U.S.C. § 3561.

18 U.S.C. § 3571.

18 U.S.C. § 3581.

18 U.S.C. § 3583.

18 U.S.C. § 3585.

18 U.S.C. § 3621.

U.S.S.G. § 5E1.2.

U.S.S.G. § 5H1.3.

U.S.S.G. § 5H1.4.

B.o.P., Policy Statement 5880.28.

B.o.P., Program Statement P5160.05:  Designation of State Institution for Service of
    Federal Sentence (Jan. 16, 2003).

Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government
    Segregated America*, Liveright, May 2017.

/s/ *William L. Welch,* III

William L. Welch, III

D.C. Bar No. 447886

wlw@wwelchattorney.com

5305 Village Center Drive, Suite 142

Columbia, Maryland 21044

Telephone: (410) 615-7186

Facsimile: (410) 630-7760

Counsel for Floyd Neal

(Appointed by this Court)

**Certificate of Service**

I certify that on this 14th day of June 2024 a copy of the foregoing Sentencing Memorandum, Motion for Concurrent Sentence and to Designate, Motion for Credit, Request for Recommendations, and Appendix were delivered electronically to Cameron Andrew Tepfer (Cameron.Tepfer@usdoj.gov) and Joshua Adam Gold (joshua.gold@usdoj.gov), Office of the United States Attorney, 601 D Street, NW, Washington, DC 20530.

/s/ *William L. Welch,* III

_____

William L. Welch, III