**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-190 (ABJ)** |
| **ASHLEY GAUSE** | |
| **D'MARRELL MITCHELL** | |
| **TERRANCE BRANHAM** | |
| **ASHAWNTEA HENDERSON** | |
| **DEAUNDRE BLOUNT** | |
| **GLENN DOLFORD,** | |
| **Defendants.** | |

**GOVERNMENT'S OMNIBUS**
**OPPOSITION TO DEFENDANT'S MOTIONS TO SEVER**

The defendants in this case are charged in two overlapping conspiracies: (1) a conspiracy to rob commercial business including cellphone stores and pharmacies; and (2) a conspiracy solely focusing on the robbery of pharmacies. The second conspiracy is a sub-set of the first conspiracy, meaning every overt act in the second conspiracy is an overt act in the first conspiracy. In addition, the defendants are charged with the substantive robberies mirroring the overt acts as well as related firearms charges for each robbery where applicable. Even though every defendant participated in a robbery of a cellphone store and a pharmacy, and therefore committed an over act in furtherance of each conspiracy, defendants move to sever arguing improper joinder and highlighting certain alleged prejudices they would endure at a join trial. But joinder of these charges is appropriate here. The two conspiracies are related given the significant overlap in the overt acts charged in both, in addition to commonalities in membership, planning, purpose, targets, methods, use of the proceeds, and the overlapping time period of the conspiracies. Further, defendants have not met

their heavy burden of identifying specific prejudice sufficient to justify severance. For the following reasons, the defendants' motions should be denied.

## **BACKGROUND**

This case involves the robbery of at least nine pharmacies and nine cellphone stores throughout D.C., Maryland, Virginia, and New Jersey, by overlapping combinations of Defendants Gause, Mitchell, Branham, Henderson, Blount, and Dolford from May 2020 through May 2021. Members of the conspiracy, led by Defendant Gause and Mitchell, conducted research into potential store targets, drove sometimes significant distances to rob these stores, burst into the stores when they were thinly occupied, stole cellphones and narcotics, and then distributed the proceeds. Gause and Mitchell were the constants in the conspiracy, apparently recruiting others, in some cases younger men. The recruited individuals switched in and out of the conspiracy over time, oftentimes conducting the actual robberies while Gause and Mitchell remained in vehicles. Gause primarily served as the driver in these offenses but had connections with individuals who could resell phones and narcotics. Following these robberies, Gause would communicate with the sources and negotiate prices for the sale of the robbery proceeds. Based on their offenses, the defendants are charged with the substantive robberies and related firearms charges in which they participated (Counts Three through Twenty-One), as well as two conspiracies (Counts One and Two). The first conspiracy charge covers every commercial business robbed by members of the conspiracy, while the second focuses on a sub-set of those involving the robbery of the narcotics from pharmacies. Every one of the charged defendants participated in both charged conspiracies.[1]

---

[1] Defendant Dolford is not currently charged in the drug conspiracy (Count Two), but the Government intends on superseding to add him to Count Two, in addition to charging the Midlothian robbery described *infra* p.7.

Other than the two conspiracy charges, every other charged count is also an overt act in the charged conspiracies.

### *Count Three - May 9, 2020: Walgreens in Neptune, New Jersey*

At approximately 3:09 a.m., three suspects dressed in masks and gloves entered Walgreens. The suspects jumped over the pharmacy counter and demanded Codeine, Adderall, and Percocet. The suspects placed the drugs in a black plastic trash bag and a gym duffle with the number "21" on the side. The suspects removed various bottles of liquid Codeine, Oxycodone, Percocet, Adderall, and Nucynta.  Law enforcement responded and observed the suspects entering a new model black Nissan Altima four door vehicle bearing an unknown out of state registration. The suspects fled in the vehicle which was operated by a fourth masked suspect.  As the suspects attempted to flee, the suspect vehicle collided with a responding officer's patrol car and then fled the area. Law enforcement pursued the vehicle, but the suspects managed to escape.

Defendants Gause, Henderson, Blount, and Mitchell are charged in relation to this robbery.

Cellsite location data reflects devices associated with Gause and Blount traveling from Washington, D.C. to the area of the robbery in New Jersey during the evening of May 8, 2020, and then immediately back to Washington, D.C., following the May 9, 2020 robbery.  Gause's device also appears to travel the same route that the suspects used to escape police following the robbery.

Surveillance footage from the robbery reflects that one of the suspects loaded the stolen prescription drugs into a gray and black duffel back with the number "21" in yellow.  Mitchell's brother wore the number "21" for the University of Maryland (UMD) basketball team, and law enforcement confirmed that the bag in surveillance matched that which would have been provided to UMD basketball players during the time period when Mitchell's brother played there. Additionally, a cellphone associated with Mr. Mitchell contains similar searches for pharmacies

in South Carolina, North Carolina, Rhode Island, Pennsylvania, Virginia, Maryland, and Washington, D.C., as well as a search for "walgreens pharmacy new jersey locations."

Five hours after the robbery, Gause called a known drug distributor in the Greenleaf Gardens area of Washington, D.C.  Her phone reflects a picture of her dated May 9, 2020 with Henderson and this drug distributor in what appears to be the interior of a hotel, as the three consume what appears to be "Purple Drank," a mixture containing Promethazine-Codeine. Promethazine-Codeine bottles were stolen from the Neptune Walgreens and, in fact, Gause's phone contains a video dated May 9, 2020 of a bottle of Promethazine-Codeine consistent in appearance with a bottle stolen from Neptune and apparently filmed in the same hotel.  The images on Gause's phone are consistent with the interior of the Canopy Hotel at 1600 Rhode Island Avenue NW.  Cellsite location data reflects that Gause's and Blount's devices were located in the vicinity of this hotel the morning of May 9, 2020.

Six hours after the robbery, while Gause's device remained in the vicinity of the Canopy Hotel, she placed a call to the drug dealer referenced above.  A review of messages exchanged between Gause and this individual in May 2020 reflect that Gause regularly discussed selling this individual different narcotics, negotiating the prices, including specifically discussing the sale of one of the types of narcotics stolen from Neptune in a May 9, 2020 conversation.

### *Count Four - June 8, 2020:  CVS in Nottingham, Maryland*

At approximately 3:15 a.m., three black males ran into CVS. They were all wearing hoods, masks, and yellow gloves. One employee was thrown to the ground. Another employee was told to "empty the safe" and "give over the narcotics." The safe was not opened but the employees handed over their phones, wallets, and a bottle containing 100 hydrocodone pills. The suspects exited into a getaway vehicle. A yellow glove identical to the gloves being worn by the suspects

was located on the ground behind the pharmacy and seen falling from the UMD basketball duffle bag used during the robbery.

Defendants Mitchell, Blount, and Dolford are charged in relation to this robbery.

On June 8, 2020, cellsite location data reflects that Blount's and Gause's devices were in a similar area of southwest Washington, D.C.  Blount's device then traveled from Washington, D.C. to the robbery location at the approximate time of the robbery, and then immediately back to Washington, D.C.  Seventeen minutes after the robbery, cellsite location data places Blount's and Dolford's devices in close proximity near Baltimore.  An hour after that, Blount's, Dolford's, and Gause's devices appeared to be in close proximity in southeast Washington, D.C.  Additionally, approximately two hours after the robbery, Dolford's device called a Walgreens Pharmacy in Beltsville, Maryland in an apparent attempt to identify additional targets.

Surveillance footage reflect that one of the suspects was carrying the same duffel bag from the May 9, 2020 robbery associated with Mitchell's brother.  A DNA profile developed from the glove dropped from the UMD duffel bag matched Mitchell's DNA.  Further, surveillance footage from the May 9 and June 8 robberies reflects an individual in both robberies consistent in appearance with Mr. Mitchell.

### *Count Five - June 9, 2020:  T-Mobile in College Park, Maryland*

On June 9, 2020, at approximately 12:17 PM, three suspects entered the T-Mobile located in College Park, Maryland, directed two employees to the back of the store, and stated "give me all the phones or I'll kill you.  One of the suspects directed one employee to lay on the ground while the other was forced to open the safe containing cellphones.  At least one of the suspects held a hand to his waistband as if to indicate he was armed.  The suspects stole cellphones and

other accessories totaling approximately $20,226 before fleeing in a silver Volkswagen Jetta that was later recovered.

Defendants Dolford, Blount, and Mitchell are charged in this robbery.

A tracking device was hidden among the stolen items, and law enforcement tracked the device to southeast Washington, D.C. where they found the silver Volkswagen Jetta used in the robbery and matching the description of the vehicle used in the June 8, 2020 robbery. Cellsite location data places Dolford's device in close proximity to where the vehicle was recovered after the robbery. Additionally, Dolford called Defendant Gause multiple times while in that area after the robbery. Records reflect that the silver Jetta had been rented by Dolford on May 28, 2020. Further, a cellphone was left in the vehicle. A search warrant reflects that the cellphone belonged to Blount.

A distinctive multi-colored hoodie was recovered from the Jetta. The hoodie matched a sweatshirt observed on a suspect in the June 8 and June 9 robberies. A DNA profile from the hoodie match Dolford's DNA. Additionally, Dolford had posted pictures of himself on Instagram wearing the same sweatshirt and shoes that also match one of the suspects.

The silver Jetta was consistent in appearance to the vehicle used in the June 8, 2020 robbery as well as the June 9 robbery. DNA profiles were obtained from the vehicle and evidence recovered from inside the vehicle, including yellow and black gloves consistent with those observed on surveillance video, as well as a related vehicle. These DNA profiles match Defendants Gause, Dolford, Blount, and Mitchell.

When law enforcement responded to the area where the tracker was pinging and found the Jetta they observed individuals removing items and walking away. The tracker began moving with them. Law enforcement tracked the device a second time and found the device in a 2011 black

Buick Regal. The Buick was determined to be stolen. Inside the Buick, law enforcement recovered multiple items that were stolen from the T-Mobile store, including black and yellow gloves and a UMD basketball bag. DNA profiles were developed from the evidence recovered in the Buick and the vehicle itself. On a glove similar to the one worn by the suspects, Mitchell's DNA was found.

Cellsite location data reflects that Blount and Dolford traveled from Washington, D.C. to the robbery location at the time the robbery occurred, and then immediately back to Washington, D.C. following the robbery.

### *Currently Uncharged - August 5, 2020: Walgreens Pharmacy in Midlothian, Virginia*[2]

On August 5, 2020, at approximately 6:00 AM, two suspects entered a Walgreen's Pharmacy located at 6851 Temie Lee Parkway, Midlothian, Virginia. One suspect went to the pharmacy and jumped the counter before grabbing the pharmacist and directing her to the back of the store. The second suspect grabbed a second employee. The suspects stole approximately $13,220 worth of narcotics along with cash from the register.

Cellsite location data for Gause's device reflects that she traveled from Washington, D.C. to the robbeyr location at the reported time of the robbery. Her device remained in close proximity to the robbery location during the robbery. Mitchell's device appeared to have been turned off during the robbery. Less than three hours before the robbery, Defendant Mitchell's device searched the exact address of this robbery location. Immediately before the robbery, Gause's device called this exact Walgreen's pharmacy. And after the robbery, Gause took a video on her device of her driving in a BMW with a passenger wearing black pants. The vehicle appears to be

---

[2] Gause and Mitchell have not yet been charged for this offense, but the Government intends on charging them by superseding indictment.

a BMW and the reported robbery vehicle was also a BMW.  Mitchell's device connected to a BMW vehicle on August 5, 2020.  Additionally, Gause's device contained an image dated August 5, 2020 of various narcotics, including ones consistent in appearance with those that were stolen.

Surveillance footage reflects that the suspect is similar in appearance to Mitchell and wearing a similar head covering to the one Mitchell wore during the June 8 and June 9 robberies. Additionally, the suspect was wearing black pants like the passenger in the BMW filmed by Gause.

Less than four hours after the robbery, Gause placed a phone call to a known drug dealer with whom she had exchanged messages following a different robbery.  She informs that dealer "Got some shit."

### Count Six - November 6, 2020: T-Mobile in Washington, D.C.

On November 6, 2020, at approximately 2:05 PM, two suspects entered a T-Mobile store at 721 D Street SE, Washington, D.C., pretending to be customers.  The suspects briefly left the store but returned fourteen minutes later.  One of the suspects brandished a handgun and held the store's employees as well as other customers at gunpoint.  The suspects demanded iPhone model 12s and stated "give us the phones before I shoot your b[@#$%] ass."  The suspects also demanded cash from the register and emptied the pockets of the store customers.  The suspects stole three phones and $302.

Defendants Gause and Mitchell are charged in this robbery.[3]

Cellsite location data reflected that shortly before the robbery, Mitchell's and Gause's devices were in close proximity to each other in the Chinatown area of Washington, D.C.  Gause's device was then in close proximity to the robbery location during the robbery.  Mitchell's device

---

[3] The third suspect was identified as a juvenile who has not been charged.  This individual is the same one who was involved in the other November offenses described below.

appears to have been turned off during the robbery but was traveling in a direction consistent with the robbery location six minutes prior to the robbery.

Gause's cellphone contains an image dated November 6, 2020 with metadata reflecting it was created approximately forty minutes after the robbery. The image reflects device information for an iPhone 12 that is still in the packaging. The serial number for the device is visible and matches one of the phones stolen during the robbery. Gause's phone also contains of Mitchell dated November 6, 2020, with metadata reflecting that it was taken at approximately the same time as the photo of the stolen iPhone. Mitchell is standing outside of a telephone store in Washington, D.C. which is known to purchase and re-sell cellphones and other digital devices. The individual who owns the store is saved in Gause's phone as the emojis "📱🔌," which signify "phone plug."

Cellsite location data for Gause's device places her at the same store at the same time the photo was taken.

### *Count Seven - November 9, 2020: Russell Cellular in Washington, D.C.*

On November 9, 2020, at approximately 1:13 PM, two suspects entered the Russell Cellular store at 5252 Wisconsin Avenue, Washington, D.C., gesturing at their clothing as if they were carrying weapons. The suspects demanded money from the register and ordered a store employee to open the safe. The suspects directed the employee to fill a bag with iPhones. The suspects stole eighteen iPhones, an Apple watch, and approximately $250 before fleeing in a black Dodge Charger.

Defendants Gause and Mitchell are charged in this robbery.

Cellsite location data for both Gause and Mitchell places them in close proximity to the store at the time of the robbery. Additionally, one of the suspects is apparently the same juvenile suspect used in the November 6 robbery.

### *Count Eight - November 11, 2020: T-Mobile in Washington, D.C.*

On November 11, 2020, two suspects entered the T-Mobile located at 2460 Market Street NE, Washington, D.C. The suspects grabbed one employee and directed another to the backroom to open the safe. The employee who entered the backroom closed the door and called the police. The suspects proceeded to bang on the door and threatened to kill the other store employee. In response, the employee opened the door and observed the suspects holding their hands under their jackets as if they were armed. One suspect also had a knife.

The store employee filled a bag with iPhones and another employee filled a different bag with additional iPhones. The suspects also directed the employees to open the cash registers, ultimately stealing approximately $600, before fleeing.

Surveillance footage reflected that the suspects had been driven to and from the robbery by a third suspect in a dark four-door vehicle. This vehicle is consistent with the vehicle used in the November 12, 2020 robbery described below. A tracker was placed in one of the bags of iPhones and law enforcement tracked it to an alley on North Capitol Street NE. Law enforcement recovered the iPhones from the alley but not the stolen cash.

Defendants Gause and Mitchell are charged in this robbery.

Cellsite location data for Defendant Gause's device places her in close proximity to the robbery location at the time of the offense and then traveling in the same direction as the tracker after the robbery. Additionally, five minutes after the robbery began, Gause communicated with the individual known to re-sell phones referenced with respect to the November 6, 2020 robbery. Mitchell's phone appears to have been turned off during the robbery, but after the robbery, it was in close proximity to the alley where law enforcement recovered the stolen phones and the tracker.

### *Count Nine - November 12, 2020: Glen Echo Pharmacy in Bethesda, Maryland*

On November 12, 2020, at approximately 7:58 PM, two suspects entered Glen Echo Pharmacy in Bethesda, Maryland and ran to the back of the store where the prescription medication was located.  The suspects held their hands under their clothes as if they were armed.  The suspects forced two employees to the ground and demanded specific narcotics from them.  After physically assaulting two of the employees, the suspects forced the employees to place narcotics in a bag. The suspects then fled in a dark Toyota consistent with the vehicle used in the November 11, 2020 robbery.

Defendants Gause and Mitchell are charged in this robbery.

Cellsite location data reflects that Gause's and Mitchell's devices were located close to each other in Washinton, D.C. before and after the robbery.  At the time of the robbery, Gause's device was in close proximity of the robbery.  While Mitchell's device appears to have been turned off at the time of the robbery, prior to the robbery, his device was moving in a direction consistent with travel to the robbery location and it's movement afterwards tracks Gause's movement.

### *Count Ten - January 12, 2021:  Verizon in Washington, D.C.*

On January 12, 2021, at approximately 6:03 PM, two suspects walked into a Verizon store located at 703 8th Street SE, Washington, D.C.  One of the suspects brandished a black handgun and ordered the store employees to the back of the store.  The suspect grabbed a trashcan, dumped its contents on the floor, and then filled the trash can with iPhones and airpods.  The suspects then fled the store.

Defendants Gause, Branham, and Mitchell are charged in relation to this offense.

Approximately forty-five minutes before the robbery, Mitchell's device searched "verizon wireless near me."   At the time of the search, Mitchell's device was located in southeast Washington, D.C.   The closest Verizon store to that location was the store robbed shortly

afterwards.  Mitchell also placed a call to the Verizon store at around the same time, likely nchecing that the store was open.  After Mitchell called the Verizon store, in the hour leading up to the robbery, Mitchell exchanged multiple phone calls with Gause and Branham.

During the robbery, cellsite location data places Gause's and Branham's devices at the location of the robbery.  While Mitchell's phone appears to have been turned off during the robbery, it was located at the robbery location one hour before the robbery, while he was on the phone with Gause.  Branham, Mitchell, and Gause also exchanged calls immediately following the robbery.

The day after the robbery, Branham messaged Gause the following: "12 mini black 64g, 12 mini white 64g, 12 mini black 128g, 12 mini black 128g, Se mini black 128g, Se mini black 128g, 12 mini blue 128g, Se mini black 128g, Se mini black 64g."  This is consistent with the items stolen from the Verizon store.  Shortly after that message, Gause messaged the phone re-seller referenced with respect to the November 6, 2020 offense a photo of an iPhone SE still in its packaging.  That iPhone was confirmed by IMEI to have been stolen during this January 12 robbery.  Gause and the phone re-seller then exchanged a series of texts in which they appear to negotiate prices for what Gause describes as "All Verizon," including referencing specific models stolen during the robbery.

The suspect who brandished the firearm during this robbery was apparently left-handed and walked with a noticeable impediment.  Defendant Branham is both left-handed and walks with a similar impediment.

### *Count Eleven - February 14, 2021: CVS Pharmacy in Henrico, Virginia*

On February 14, 2021, at approximately 4:36 AM, one suspect entered a CVS Pharmacy at 10901 West Broad Street in Henrico, Virginia.  After that suspect appeared to make a phone

call, he was joined by a second suspect inside. The suspects approached the pharmacy counter, with one of them brandishing a handgun, and demanded that an employee provide them codeine, hydrocodone, and oxycodone. The suspects held one employee at gunpoint while demanding that the pharmacist open the safe and provide them with narcotics. The suspects gathered significant quantities of narcotics, including Percocet, oxycodone-acetaminophen, hydrocodone-acetaminophen, codeine, and Adderall and then fled in a red SUV.

Defendants Gause, Mitchell, Neal, and Branham are charged in relation to this offense.

Cellsite location data reflects that Mitchell and Gause had previously driven from Washington, D.C. through North Carolina on November 30, 2020, searching for potential targets. After leaving North Carolina, Gause's and Mitchell's devices traveled to Henrico, Virginia and were in the vicinity of this CVS Pharmacy. Gause's device reflects her searching for a pharmacy in Henrico, Virginia at the time that her and Mitchell's devices were co-located in close proximity to the robed pharmacy. Gause's phone also contains images of Mitchell apparently taken at a mall in Henrico, Virginia.

On February 13, 2021, five hours before the robbery, Mitchell searched on his phone for a CVS pharmacy located at 10901 West Road Street, Henrico, Virginia. At the time of the search, Mitchell and Gause's devices were located close to each other in southeast Washington, D.C. One minute after conducting this search, Mitchell called the CVS Pharmacy in Henrico and was on the phone for seven minutes.

Surveillance footage reflects that the two suspects who entered the pharmacy are consistent in appearance and, with respect to Branham, walking impediment to Branham and Neal. Branham who is left-handed, primarily relies upon his left hand during the robbery. The suspect believed to be Neal is wearing a black jacket with a distinctive patch on the shoulder matching one in which

Neal is pictured on his Facebook account.  The footage reflects that one of the suspects used a phone in the pharmacy prior to committing the robbery.  Call records reflect that Branham called Neal at the same time as the suspect is using a phone on surveillance footage.

Cellsite location data reflects that Gause's, Branham's, and Neal's devices traveled from Washington, D.C. early in the morning on February 14, 2021, to the location of the robbery and were present during the robbery.  The data reflects that Gause and Branham then traveled immediately back to Washington, D.C. following the robbery.  Mitchell's phone was apparently turned off during the robbery.  At the time Mitchell called the CVS Pharmacy in Henrico, however, his phone was located close to both Gause's and Branham's devices.  Shortly before Gause departed for Henrico, Gause and Mitchell exchanged multiple calls.

Four days after the Henrico robbery, Gause exchanged several messages with a known drug dealer in which she sends images of items that appear to have been stolen in Henrico and discuss pricing.

### _Count Twelve - March 24, 2021: Morgan Pharmacy in Washington, D.C._

On March 24, 2021, at approximately 11:45 AM, one suspect entered Morgan Pharmacy located at 3001 P Street NW wearing a yellow construction vest.  The suspect informed a store employee that he wanted to pick up his prescription and stated his name was "Thomas."  When the employee turned around, the suspect walked around the counter holding his hand in his waistband and ordered the employee: "Go in the back and get the safe and narcotics."  The suspect handed the employee a plastic bag and demanded that he fill it with oxycodone.  The suspect then grabbed the store's pharmacist by her shoulder and told her to help the other employee.  The suspect also demanded codeine.  The employee handed the filled bag to the suspect and the suspect fled the scene in a silver Nissan.

Defendants Branham and Neal are charged with this robbery.

The store employee who was robbed identified Defendant Branham in a photo array, indicating that he was one-hundred-percent confident in his identification of Branham as the man who robbed him. Branham also matches the physical appearance and gait of the suspect based on surveillance footage.

A silver Nissan matching the description of the robbery vehicle was tied to a relation of Branham and was photographed outside that relation's residence. Floyd Neal's cellphone contained images dated March 26, 2024 of what appears to be the same vehicle.

In the hour leading up to the robbery, Gause and Branham exchanged multiple calls and messages. Branham also called Mitchell once, as well as a number ending in 2439. Mitchell had sent the same 2439 an image of apparently stolen iPhones in a black duffel bag following a May 5, 2021 robber of an AT&T store detailed below. Additionally, Branham had previously called this number while traveling back to D.C. with Gause from the location of the Henrico, Virginia robbery. At the time that Gause was speaking to Branham on the phone, her device was traveling in the direction of the robbery location approximately thirteen minutes prior to the robbery and was in close proximity to the robbery at the time of the robbery.

### *Count Thirteen - March 25, 2021:  Walgreens in Alexandria, Virginia*

On March 25, 2021, at approximately 9:51 PM, two suspects entered a Walgreens Pharmacy at 4515 Duke Street, Alexandria, Virginia. Both were wearing yellow construction vests similar in appearance to that worn by the March 24 robbery suspect. One suspect then forced an employee behind the counter while the other stood in the aisles keeping watch. The suspect with the store employee stated: "Give me all the money . . . oh you think I'm playing," as he reached towards his waistband indicating that he was armed." The suspects directed the store's employees

to the store's office and continued to demand money and directed the employees to open the safe. The suspects took approximately $7,000 to $10,000 from the safe before fleeing in a silver Nissan.

Defendants Neal and Branham were charged with this offense.

Surveillance video reflects that one of the suspects was using his phone during the robbery. At the time of that call, records reflect that Defendant Neal's device received a call. Cellsite location data places Defendant Neal's device in close proximity to the robbery location. Branham's physical appearance, including the reflective vest worn in the March 24 robbery and his distinctive gait, match the appearance of one of the two suspect.

Additionally, Branham's device exchanged multiple lengthy calls with the number ending in 2439 that was in contact with members of the conspiracy in relation to other robberies. Branham also tried to contact Gause.

### March 31, 2021 Armed Robbery and Carjacking[4]

On March 31, 2021, a woman parked her 2015 Mercedes E350 near her residence in District Heights, Maryland and exited the vehicle. Three armed suspects approached and demanded that she give them her belongings, cash, and keys to the car. The suspects then forced the victim to her residence, striking her in the head with a handgun, and at one point grabbing her hair. The suspects forced the victim to open her residence and then ransacked the apartment and stole additional belongings.

This offense is an overt act in which Defendant Gause and uncharged co-conspirator Anthony Thomas, Jr. were involved.

Approximately six hours prior to the robbery, Thomas Jr. added Gause to his phone under her nickname. Prior to this, the two did not appear to have previous telephonic communications.

---

[4] Charged only as an overt act.

One of the individuals involved in the carjacking is visually similar to Thomas Jr., including an apparent hand tattoo visible on surveillance. Cellsite location data for Gause's device reflects that she traveled from Washington, D.C. to the area of the armed robbery and carjacking at the time of the offenses, and then immediately back to Washington, D.C. following the offenses.

Following the carjacking, on March 31, 2021, Gause exchanged messages with an individual in which she sent a partial a photo of what appears to be the carjacked vehicle and has a conversation in which she appears to be offering the car for sale to the individual. The carjacked Mercedes was used in two subsequent armed robberies by Branham and Neal, following which Branham and Neal were arrested.

### *Count Fourteen - March 31, 2021: CVS Pharmacy in Beltsville, Maryland*

On March 31, 2021, at approximately 6:12 AM, two suspects entered the CVS Pharmacy at 11729 Beltsville Drive in Beltsville, Maryland. One suspect went behind the counter, grabbed an employee, and demanded the code to the safe. The two employees in the store stated that they did not know the code. Shortly afterwards, another store employee entered the store. A suspect grabbed the employee and demanded the code to the safe, showing the employee a black firearm in his waistband. The same suspect demanded that two of the employees take him to the office where the safe was located and directed the other suspect to watch the remaining employee and take money from the registers. In the office, the suspect forced an employee to open the safe and removed the money in the safe, placing it in one of the employee's purses. The suspects stole approximately $4,548 before fleeing in a car consistent in appearance with the carjacked Mercedes.

Defendants Gause, Branham, and Neal were charged with this robbery. The robbery vehicle was consistent with the carjacked Mercedes described above. This vehicle ewas recovered after Branham and Neal were arrested in connection with an April 1, 2021

robbery in Manassas, Virginia. The fob to the carjacked vehicle was recovered from Branham's person following his arrest. Branham and Neal subsequently were charged in Virginia and subsequently pled guilty in relation to that robbery.

Surveillance footage reflects that the two suspects were consistent in appearance with Branham and Neal, including Branham's distinctive gait. Additionally, the clothing of the suspects in this robbery are consistent with the clothing worn by Branham and Neal during the Manassas robbery.

In the few hours before this robbery, Gause's device conducted searches for CVS pharmacies located in Maryland and Virginia. Cellsite location data reflects that between 5:17 AM and 5:49 AM, Gause's device was located in close proximity to a CVS in Laurel, Maryland. Twenty minutes before the robbery, Gause messaged the address of the robbed CVS to an individual and then used the Waze navigation application to search the address of the robbed CVS. During the robbery, Gause's device was located in close proximity to the robbery location. Following the robbery, Gause's device then left the robbery location and traveled back to Washington, D.C.

### _April 1, 2021 Robbery: CVS Pharmacy in Manassas, Virginia[5]_

On April 1, 2021, at approximately 2:51 AM, Branham and Neal entered the CVS Pharmacy in Manassas, Virginia. An employee noticed them and suspecting they were about to rob the store locked herself in an office and called 911. Branham grabbed another employee by the neck and slammed her face-first into the ground. He then grabbed two other employees and forced them to the pharmacy. There, Branham threatened one employee stating he would "blow her head off" if she did not open the safe. Neal then approached and threatened to harm a different

---

[5] Charged only as an overt act.

employee if she did not give him all of the "Percocets and oxy."  As they waited for the safe to open, Neal threatened to harm the same employee if she did not open the cash registers.  Neal and Branham emptied the registers and safe, fleeing with approximately $1,744 and more than $100,000 worth of narcotics.  Neal and Branham fled outside and attempted to flee on foot before they were arrested.

Defendants Gause, Branham, and Neal were charged with this robbery.

When police arrived at the CVS, an officer observed a dark blue Mercedes consistent with the carjacked vehicle that had been used in the Beltsville robbery.  The vehicle fled at high speed with its headlights off as officers arrived. As noted above, the carjacked Mercedes was later recovered in District Heights, Maryland.  The fob for this vehicle was recovered from Branham's person at the time of his arrest.

The day after the robbery, Mitchell sent Gause a text message linking to a news article about Branham and Neal's arrest. Neal and Branham subsequently pled guilty and were sentenced for their involvement in this robbery.

### Count Sixteen - May 4, 2021: AT&T Store in Wheaton, Maryland

On May 4, 2021, at approximately 11:00 AM, Anthony Thomas Jr. entered an AT&T store located at 11427 Georgia Avenue, in Wheaton, Maryland.  He locked the front door and forced two people to the ground at gunpoint.  He was armed with a black firearm equipped with an apparent yellow machinegun conversion device.  Thomas forced one of the individuals in the store to fill a backpack with iPhones and airpods before fleeing.  He stole twenty-seven iPhones and two sets of airpods.

Defendants Gause and Mitchell, and uncharged co-conspirator Thomas were involved in this robbery.  Thomas was charged and subsequently pled guilty to this robbery.

Two hours before the robbery, Gause messaged Mitchell sending Thomas' phone number. Thirty minutes later, Gause sent Mitchell a screenshot of a Google search result for the AT&T store at 11427 Georgia Avenue. Thirty minutes before the robbery, Gause's device used the Waze navigation application to search for the exact same store location. Gause's device was found to contain an image of a black firearm with an extended magazine and an apparent machine gun conversion device sitting on a stack of cash. This is consistent with the firearm used during the May 4, 2021 robbery as well as one subsequently recovered when Thomas was arrested following an additional robbery.

In the two-and-a-half hours leading up to the robbery, Gause and Thomas exchanged at least ten phone calls. Thomas and Mitchell exchanged one call thirty minutes before the robbery and then eight calls after. Prior to May 4, 2021, there is no record of Mitchell and Thomas communicating.

Cellsite location data reflects that Gause's and Mitchell's devices traveled from Washington, D.C. to the vicinity of the robbery during the robbery and then returned to Washington, D.C. immediately afterwards.

At 8:14 PM, following the robbery, Mitchell messaged a known girlfriend of his an image of Apple airpods still in its packaging stating: "I was going Surprise you with your head phone an all." Airpods were among the stolen items. At 11:30 PM, following the robbery, Mitchell messaged Gause "Send it." Gause responded with the contact information for the phone plug with whom she had previously negotiated. Mitchell then placed two phone calls to the phone plug's number. At 12:26 PM, Gause messaged the phone plug "12 pro, 7 pro max, 5 12, 2 se." This totals twenty-six phones. Thomas stole twenty-seven from the AT&T store.

***Count Eighteen - May 5, 2021:  AT&T in Hyattsville, Maryland***

On May 5, 2021, at approximately 11:24 AM, Thomas entered an AT&T store carrying what appeared to be a black handgun with an extended magazine and apparent yellow machinegun conversion device.  Thomas pushed it against a store employee's side and said: "you already know what time it is."  Thomas forced the employee to the back of the store where he made the employee fill a trash bag with iPhones and cash.  Thomas fled with thirty-eight or thirty-nine iPhones and $315.

Defendants Gause, Mitchell, and uncharged co-conspirator Thomas were involved in this robbery.  Thomas was charged and subsequently pled guilty to this robbery.

One hour after this robbery, Gause messaged her phone plug, "6 12pro max, 5 12pro, 7 12, 6 se, 3 12 pro mini, 10 11," an apparent reference to different iPhones.  This totals thirty-seven iPhones.  Thomas stole thirty-eight or thirty-nine.  As noted above, Gause's phone contains an image of cash and a firearm with a yellow machinegun conversion device consistent with that observed in the May 5 robbery and recovered following a May 7 robbery.

On May 5, 2021, Mitchell messaged an individual a picture of three individuals standing around a bag of numerous packaged iPhones in a black duffel bag.  Mitchell had messaged this same individual before the March 24 Morgan Pharmacy robbery, and before and after the March 25 Walgreens Pharmacy.  Branham also placed a call to this same individual as he and Gause traveled back to Washington, D.C. from Henrico, Virginia after the February 14 robbery there.

On May 5, 2021, Gause and Thomas exchanged calls at least fourteen times prior to the robbery, and once after.  That same day, Gause and Mitchell exchanged calls five times prior to the robbery, and sixteen times after.  Cellsite location data reflects that Gause's device was in the

vicinity of the robbery in Hyattsville, Maryland during the robbery, and then traveled to Washington, D.C. immediately after the robbery.

### *Count Twenty - May 7, 2021: AT&T in Laurel, Maryland*

On May 7, 2021, at approximately 10:30 AM, Thomas entered an AT&T store at 14700 Baltimore Avenue in Laurel, Maryland. He removed a handgun from his waistband and forced the two store employees to the rear of the store at gunpoint. He then forced the employees into the inventory room and directed an employee to put all the iPhones and airpods into a plastic bag. He also demanded that the employee open the safe. Thomas placed the stolen goods into a plastic container and began dragging it to the front of the store.

As he exited the store, Thomas was immediately confronted by law enforcement. He dropped the property and fled. Thomas carjacked a vehicle and attempted to drive away at high speed, before crashing into another vehicle carrying an elderly couple who were both hospitalized as a result. Thomas was arrested and ultimately pled guilty to this and the other robberies outlined above. When he was arrested, Thomas was carrying the black handgun with an extended magazine and yellow machinegun conversion device which was used in the May 4, May 5, and May 7 robberies. An image of what appears to be the same firearm was recovered on Gause's phone dated May 5, 2021.

Cellsite location data reflects that Gause's device traveled from Washington, D.C. to the robbery location, remained there during the robbery, and then immediately traveled back to Washington, D.C. following the robbery.

Defendant Gause and uncharged co-conspirator Thomas were involved in this robbery. Thomas was charged and subsequently pled guilty to this robbery.

***May 26, 2021: CVS Pharmacy in Pasadena, Maryland[6]***

On May 26, 2021, at approximately 1:04 AM, three suspects entered a CVS pharmacy at 28 Magothy Beach Road, in Pasadena, Maryland. The suspects approached an employee at the register and demanded that she put her hands up and hand them her phone. The employee complied and the suspects zip-tied her hands. Two suspects remained with that employee, while another approached the pharmacist. The suspects with the employe demanded that she take them to the safe. She provided the code to the safe and the suspects emptied it. The third suspect jumped into the pharmacy and forced the pharmacist to open the safe there. The pharmacist opened one safe but attempted to delay opening the second safe. The suspects ordered both employees onto their knees and threatened to hurt or kill them. The suspects were holding their hands in their pockets as if they were armed. The suspects then fled with approximately $3,959 in cash and eighty bottles of prescription medication.

Law enforcement arrived as the three suspects were fleeing. One suspect (later identified as Gause) fled in a vehicle. The other two suspects (Deangelo Mitchell and a juvenile) fled on foot. Mitchell was arrested in a nearby restaurant. Gause led police on a high-speed chase for nearly forty-four miles. She continued driving despite law enforcement deploying stop sticks and destroying her tires. The vehicle in which Gause was stopped and arrested had been rented by her significant other two days before.

Gause's device reflected that she was conducting searches for different pharmacies in Maryland in the hours before the robbery. Similarly, over the course of the day on May 25, 2021, the day before the robbery, Mitchell conducted multiple different searches for pharmacies in South Carolina, Virginia, Maryland, and Washington, D.C. Cellsite location data reflects that Gause's

---

[6] Charged only as an overt act.

device traveled from Washington, D.C. to the robbery location the evening of the robbery, and remained there during the robbery.

Mitchell and Gause subsequently pled guilty and were sentenced for their role in this robbery.

### *Additional Evidence of the Conspiracies*

Throughout the life of the conspiracies, Gause's and Mitchell's devices contain numerous messages discussing and exchanging images and directions of specific pharmacies and cellphone stores throughout the area. They also exchanged images of various pharmaceuticals. In one exchange, on October 31, 2023, Gause and Mitchell discuss robbing "a sneaky 24," in apparent reference to a 24-hour pharmacy. Mitchell counter-proposes robbing a cellphone store to "snatch 8 iPhone 12" instead. Gause directs Mitchell—consistent with the general structure of their robberies—that he needs to take someone with him to commit such a robbery.

Recorded jail calls between Defendant Gause and Branham provide further insight into the structure of the conspiracy. After an associate of the defendants was called to grand jury, Defendant Branham spoke to Gause and stated "They pushed up on some folks that's kind of close to the members," in apparent reference to the structured criminal organization to which Gause and Branham both belonged. In a different call, Branham indicates that he needs Gause to find him an associate to assist him in robberies, referencing his prior relationship with Floyd Neal, consistent with the pattern of these robberies where more experienced members (Gause and Mitchell) identify targets and provide logistical support (such as driving and sourcing dealers and re-sellers), while other members directly commit the robberies. As Ms. Gause herself put it in a jail call: "Let Cray [Gause's nickname] illustrate, orchestrate."

**ARGUMENT**

**I.    These Offenses Are Properly Joined Against These Defendants**

Joinder in the co-defendant context is governed by Rule 8(b).  *United States v. Brown*, 16 F.3d 423, 427 (D.C. Cir. 1994) (the D.C. "Circuit has long established that 'the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and . . . Rule 8(a) has no application.'" ((quoting *United States v. Jackson*, 562 F.2d 789, 794 (D.C. Cir. 1977)).

Rule 8(b) permits joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b); *see also United States v. Wilson*, 605 F.3d 985, 1015 (D.C. Cir. 2010).  The joined "defendants need not be charged in each count," Fed. R. Crim. P. 8(b), reflecting the "broad policy favoring initial joinder."  *United States v. Mason*, 951 F.3d 567, 576 (D.C. Cir. 2020) (quoting *United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984)); *accord United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991) ("[T]his circuit's law makes it difficult to prevail on a claim that there has been a misjoinder under Rule 8(b)").  As to offenses properly joined under Rule 8(b), "the defendant carries the burden of demonstrating prejudice resulting from the failure to sever."  *United States v. Carson*, 455 F.3d 336, 374 (D.C. Cir. 2006).

Acts or transactions form a "series" under Rule 8(b) if they "are connected together or constitut[e] parts of a common scheme or plan."  *Perry*, 731 F.2d at 990 (internal quotation marks omitted).  The offenses must be "related"—that is, "there must be a logical relationship between the acts or transactions within the series."  *Id.*  Additionally, while a defendant need not be charged in a given offense for it to form part of a common scheme or plan with a different offense, a defendant needs to have participated in some manner in each offense.  *Id.* at 989-990.

Rule 8(b) can be satisfied by a review of the indictment alone "for instance when a conspiracy charge links all the offenses and defendants." *Perry,* 731 F.2d at 990.  This is true even where a conspiracy is not explicitly charged.  *See United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000).  The court also may review pretrial submissions offered by the Government to support joinder.  *See United States v. McGill*, 815 F.3d 846, 905 (D.C. Cir. 2016).  "[T]he Government need merely allege, not prove, the facts necessary to sustain joinder." *United States v. Gooch*, 665 F.3d 1318, 1334 (D.C. Cir. 2012).

### a. **Joinder is Proper Because the Charged Offenses are Overt Acts in Conspiracies Linked to All Defendants.**

As an initial matter, each defendant is alleged to have participated in at least one pharmacy robbery and one cellphone store robbery.[7]  In other words, each defendant participated in an overt act in both conspiracies. The fact that each defendant participated in each of the charged conspiracies is sufficient to sustain joinder.  "The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense." *United States v. Mason*, 951 F.3d 567, 576 (D.C. Cir. 2020) (*quoting United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988)). Accordingly, our courts "have frequently held that participation in the same charged conspiracy justifies joinder." *Id.*  Therefore, joinder of Counts One and Two is appropriate because each defendant is alleged to have participated in both conspiracies.  Because Counts One and Two are properly joined, the overt acts including accompanying firearms charges are also properly joined as they all relate to the same series of acts or transactions.

---

[7] By the time there is a trial in this matter, Defendant Dolford will also be charged in the PWID conspiracy in Count Two.  Therefore, in addition to each defendant participating in at least one overt act in each conspiracy, by the time of trial, each defendant will be charged in each conspiracy.

That the commercial robberies and narrow sub-set of pharmacy robberies are indicted as separate conspiracies is immaterial as a matter of law.  Multiple federal circuits have interpreted Rule 8(b) to allow "members of two or more conspiracies [to] be joined as defendants even where the members have not been charged as participating in one overarching conspiracy." *United States v. Rittweger*, 524 F.3d 171, 177–78 (2d Cir. 2008) (citing cases upholding Rule 8(b) joinder of defendants charged in separate conspiracies); *see also United States v. Martinez*, 994 F.3d 1, 12 (1st Cir. 2021) ("multiple conspiracy counts may themselves be part of the same series of acts or transactions" under Rule 8(b) "even if only because they are part of a larger uncharged scheme or plan" (internal quotation marks and citations omitted)); *United States v. Weaver,* 905 F.2d 1466, 1476 (11th Cir. 1990) ("separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions" (quotation marks and alteration omitted)). Here, given the complete overlap between the two conspiracies, they are part of the same series of acts or transactions and therefore are properly joined.

### b.  <u>The Charged Offenses are Part of a Common Scheme in which Each Defendant Participated.</u>

The conclusion that joinder is proper is only strengthened when the Court looks to the facts underlying the two charged conspiracies and the underlying overt acts.

### *<u>The Common Scheme</u>*

The charged conspiracies are both "connected together" and "constitut[e] parts of a common scheme or plan." *Perry*, 731 F.2d at 990 (internal quotation marks omitted).  Specifically, they arise from the same robberies.  Every pharmacy robbery giving rise to the drug conspiracy charged in Count Two is a charged overt act in the commercial robbery conspiracy charged in Count One.  They are not just "connected," they are identical.

The charged robberies themselves also constitute parts of a common scheme or plan. The scheme or plan across all these robberies was the same: robbing commercial businesses, stealing the cash and inventory (either drugs or cellphones and accessories), and re-selling the drugs or cellphones for profit. They share overlapping membership, with Gause and Mitchell participating in all but two. They were conducted in largely the same manner. Members of the conspiracy researched and identified targets following into two specific categories: cellphone stores or pharmacies. They did not target other commercial businesses such as convenience stores, restaurants, or banks. They often presented themselves as customers to get a sense of whether the store was occupied and by how many employees by calling ahead or walking in the store and briefly perusing before calling an accomplice to assist with the robbery. Generally, each robbery involved a driver waiting in the car while two or more conspirators entered the store.[8] The conspirators generally either brandished firearms or indicated that they were armed with their hands in their pockets or outer clothing.[9] The conspirators forced the employees to the ground or into the back. The conspirators then demanded specific items which they sought to steal. Despite

---

[8] In his motion to sever, Defendant Blount confuses the number of defendants charged in each robbery with the number of suspects involved in each robbery. ECF No. 119 at 6. Specifically, Defendant Blount claims that the November 6, 9, 11, 12, 2020 robberies were only carried out by Defendants Gause and Mitchell. *Id.* at 6 n.3. As reflected above, and made clear in discovery, in all four of those robberies, Gause and Mitchell relied upon a juvenile suspect as well. That juvenile cannot by law be charged in this case.

[9] Defendant Blount claims that the May and June robberies in which he participated were not of the same character as those that followed because none involved firearms and the May and June robbers did not appear to have the same proclivity for violence. ECF No. 119 at 6. The Government has provided discovery to Defendant Blount that directly contradicts this. While no firearms were brandished in the May 9, June 8, and June 9 robberies, during the June 8 robbery one of the suspects threw an employee to the ground and repeatedly punched him in the back of the head before stepping on his neck. During the June 9 robbery, the suspects told the store employees "give me all the phones or I'll kill you." And an employee reported that one suspect held his hand on his waistband as if he had a firearm.

the fact that Walgreens, CVS, and even the local pharmacies stock a wide variety of goods, the conspirators demanded specific narcotics such as oxycodone, Percocet, and codeine syrup. During their robberies of cellphone stores, the conspirators were similarly specific, generally only seeking iPhones and related Apple products such as air pods. This, despite the fact that these stores stocked other types of phones and devices. Following the robberies, the conspirators returned to Washington, D.C. and Gause would contact her connections who could re-sell the drugs and phones. And this conspiracy lasted over a discrete period, almost exactly one year.

In their motions to sever, Defendants Mitchell and Branham claim that Count One and Count Two are completely distinct and therefore mis-joined conspiracies. As Defendant Mitchell argues, "The narcotics conspiracy is not part of the same act or transaction [as] the robbery conspiracy . . . , it involves completely separate acts, namely alleged possession and distribution of narcotics, not robberies." ECF No. 121 at 2; *see also* ECF No. 118 at 3. This misconstrues the Government's Indictment and theory of the case. These defendants possessed with the intent to distribute the narcotics stolen from the various pharmacies when they, in fact, stole the narcotics. The Government will establish at trial that a drug user does not repeatedly steal enormous quantities of different types of narcotics and then arrange to sell them. Rather than being distinct, the robberies and possession of the narcotics are inextricably linked. Indeed, they are one in the same.[10]

---

[10] Defendant Blount asserts that the Government has not alleged that Blount engaged in any act in furtherance of the conspiracy to possess with intent to distribute narcotics charged in Count Two. ECF No. 119 at 4-5. Defendant Dolford does too. ECF No. 122 at 3. Nonsense. Defendant Blount is accused of robbing two pharmacies of significant quantities of illegal narcotics. Defendant Blount and his conspirators entered a Walgreens Pharmacy in Neptune, New Jersey and stole significant quantities of narcotics. Blount and Dolford did the same at a CVS Pharmacy in Nottingham, Maryland. Gause, with whom both defendants are connected in a variety of manners, then contacted a known drug dealer and negotiated prices for the apparent stolen drugs. Each of them committed an overt act in furtherance of the conspiracy in Count Two.

*Participation in the Common Scheme.*  Every single defendant participated in at least one robbery of a pharmacy and one robbery of a cellphone store.  That is, every single defendant participated in at least one overt act in the two charged conspiracies. Under Rule 8(b), "participation" by a defendant in a particular transaction within a series does not require that the defendant have engaged in "acts rising to the level of crime[s]," *see Kivette v. United States*, 230 F.2d 749, 753 (5th Cir. 1956) (citing *Scheve v. United States*, 184 F.2d 695, 696 (D.C. Cir. 1950) ("broadly constru[ing] 'participated' in Rule 8(b) as allowing joinder of all defendants engaged in a connected course of conduct out of which arose separate crimes alleged against different persons")).  But here, each defendant committed a crime in furtherance of the two charged conspiracies.  Therefore, every defendant sufficiently participated in these conspiracies to be joined in the same indictment.

That each defendant participated in a different number of robberies does not defeat joinder. "The government need only present evidence before trial that each defendant participated in the series of acts underlying each offense charged (though not necessarily in every act making up the series)." *United States v. Halliman*, 923 F.2d 873, 883 (D.C. Cir. 1991).  By committing an overt act in furtherance of each conspiracy, each defendant sufficiently participated in the series of acts underlying each conspiracy.  Therefore, each defendant participated sufficiently for purposes of Rule 8(b).[11]

---

[11] Defendant Gause claims that Counts Sixteen, Eighteen, and Twenty are improperly joined for lack of venue.  ECF No. 123 at 5-6.  She is incorrect.  While each of those robberies occurred in Maryland, Defendant Gause's cellsite location data makes clear that she traveled directly from Washington, D.C. to each Maryland robbery location before returning back to Washington, D.C. Notably, each of those charges are indicted under an aiding and abetting theory.  *See* 18 U.S.C. § 2.  As such, a jury could find that Gause engaged in affirmative acts in furtherance of the charged robbery and carrying of the firearm in Washington, D.C., such as arming herself or her co-conspirators, planning the robbery (including by identifying the robbery location), and driving

## II.    There is No Basis in Fact or Law to Sever the Defendants' Trials.

Defendants ask the Court to sever their trials for a number of reasons, none of them compelling.  *First*, some of the defendants claim that the evidence against them is relatively slight compared to the other defendants, which could prejudice them at trial.  *See* ECF No. 118 at 6 (Branham); ECF No 119 at 9 (Blount).  Relatedly, certain of the defendants claim that their counts should be severed from others because they participated in relatively fewer robberies than other defendants.  *See* ECF No. 119 at 9-10 (Blount); ECF No. 122 at 3 (Dolford).  *Second*, some of the defendants claim that they are not charged in offenses involving a firearm, and others are, which would prejudice them.  *See* ECF No. 122 at 3 (Dolford).  None of these arguments meets the high burden justifying severance.[12]

"There is a preference in the federal system for joint trial of defendants who are indicted together."  *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  This preference is "especially strong" where the joint trial would "require presentation of much the same evidence, testimony of the same witnesses, and involve defendants who are charged, *inter alia*, with participating in the same illegal acts."  *United States v. Tucker*, 12 F.4th 804, 824 (D.C. Cir. 2021) (internal quotation marks and alterations omitted).

Rule 14(a) nevertheless allows a court to sever a defendant's trial where there is "a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent

---

through Washington, D.C. in route to the robbery location.  *See United States v. Jones*, 786 F. App'x 907, 911–12 (11th Cir. 2019).

[12] The Government has parsed each defendants' pleadings to identify the specific grounds upon which they claim severance is justified.  Many of the filings contain conclusory statements that do not identify exactly what counts purportedly should be severed and upon what basis.  The Government has endeavored to respond to every specific prejudice identified with the joined counts but cannot meaningfully respond to vague or conclusory statements of prejudice.  Should defense counsel identify specific grounds upon which they are basing their motions to sever in reply, the Government will request the right to file a sur-reply.

the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The Rule, however, is "permissive," and "severance is not required even if prejudice is shown." *Tucker*, 12 F.4th at 825. The trial court maintains discretion, even in the joint trial of a "complex case" involving defendants with "markedly different degrees of culpability," to undertake "less drastic measures, such as limiting instructions" to "cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. "Severance is the exception rather than the rule." *Tucker*, 12 F.4th at 825. It is extraordinary relief that should be granted "sparingly." *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010). And it is the moving defendant's "heavy burden" to establish the requisite prejudice under Rule 14. *United States v. Williams*, 507 F. Supp. 3d 181, 196 (D.D.C. 2020).

### a. The Evidence Against Each Defendant is Too Strong to Justify Severance.

Severance on disparity of evidence grounds requires that a defendant establish a "*dramatic* disparity of evidence." *United States v. Moore*, 651 F.3d 30, 96 (D.C. Cir. 2011) (emphasis added). However, "when there is substantial and independent evidence of each defendant's significant involvement in the conspiracy, severance is not required." *Id.* (internal quotation marks and alterations omitted). Indeed, "[i]t is in the nature of a conspiracy prosecution that the evidence against each member will differ, and that the members of the conspiracy will have different roles. That some co-conspirators will be more central than others does not render joint trial inappropriate as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant." *United States v. Straker*, 800 F.3d 570, 628 (D.C. Cir. 2015). Simply "showing that there is more evidence against one defendant, that there are more charges against one defendant, or that the evidence is stronger against one defendant than against the others is insufficient to prevail on a demand for severance." *United States v. Gray*, 173 F.Supp.2d 1, 10 (D.D.C. 2001). The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Halliman*, 923 F.2d 873,

884 (D.C. Cir. 1991). The evidence against each of the defendants is too strong to permit severance under a disparity theory.[13]

### *The Evidence Against Defendant Branham*

In the Henrico, Virginia robbery (Count 11), Branham's cellsite location data reflects him traveling from Washington, D.C. the approximate 100 miles to Henrico, remaining in the area of the robbery during the robbery, and then traveling back to Washington, D.C. immediately following the robbery.  In the Morgan Pharmacy robbery (Count 12), the pharmacist identified Branham in a photo array, indicating he was 100% certain of the identification.  Additionally, the vehicle apparently used in the robbery is tied to a relation of Branham's.  Further, Branham communicated several times with Gause leading up to the robbery and Gause's cellsite places her in the robbery location at the time of the robbery.  With respect to the Alexandria robbery (Count 13), Branham appears to be wearing the same outfit as in the Morgan Pharmacy robbery, and the suspects use what appears to be the same vehicle tied to him.  In the Beltsville, Maryland robbery (Count 14), the carjacked Mercedes used in the robbery is the same car used in the Manassas robbery the very next day, when Branham is arrested with the fob in his pocket.  Additionally, he appears to be wearing the same outfit in the Beltsville robbery as he is when he is arrested in Manassas.  Branham is further tied to this offense through his connections to Gause, who is at the robbery location based on cellsite and search history.  Branham pled guilty to the Manassas robbery, providing corroboration for his role in these offenses.  And, in all of the robberies in which Branham participated, surveillance video reflects an individual matching his description with a distinctive limp.  Any gaps in evidence with respect to Branham are filled with his

---

[13] The Government summarizes the evidence against each defendant who objected on these grounds:  Defendants Branham, Blount, and Dolford.

statements in recorded jail calls where he expressly refers to the existence of a criminal organization, discusses his interest in re-starting the conspiracy, references his relationship with Neal, and complains that he believes certain members of the conspiracy received more of their fair share.

### *The Evidence Against Defendant Blount*

In the Neptune, New Jersey robbery (Count 3), Blount's cellsite location data reflects him traveling from Washington, D.C., to the robbery location in Neptune, New Jersey, and back to Washington, D.C. immediately following the robbery. That is a distance of more than 200 miles. Blount's device is then co-located with Gause's device near the hotel where photographs were taken reflecting stolen narcotics. In the Nottingham, Maryland robbery (Count 4), Blount's cellsite location data reflects him traveling from Washington, D.C. to the location of the robbery and then returning to Washington, D.C. immediately after the robbery. His outfit during the robbery is also similar to what he appears to be wearing during a robbery the following day. In the College Park, Maryland robbery (Count 5), Blount's cellsite location data reflects him traveling from Washington, D.C. to College Park, Maryland during the robbery, and then immediately returning to Washington, D.C. Inside the recovered robbery vehicle Blount's phone was recovered and his DNA was on a glove inside the vehicle.

### *The Evidence Against Defendant Dolford*

In the Nottingham, Maryland robbery (Count 4), Dolford wore a distinctive sweatshirt and shoes, which he also wore in a robbery the following day. Additionally, his DNA was recovered from the sweatshirt, and his Instagram has photos of him wearing what appears to be the same sweatshirt and shoes. Dolford's cellsite location data places him in the same area as Blount in Baltimore shortly after the robbery. The vehicle used in the robbery was rented to Dolford and

later recovered.  In the College Park, Maryland robbery (Count 5), the tracking device stolen during the robbery was found in the recovered vehicle rented by Dolford and containing mail matter in Dolford's name.  The sweatshirt matching the one worn during the robberies and observed on Dolford's Instagram was recovered in the vehicle, and Dolford's DNA was on the sweatshirt. Dolford's cellsite location data reflects that he traveled from Washington, D.C. to College Park for the robbery, and then back to Washington, D.C., including stopping at the location where the robbery vehicle was recovered.

In sum, there is no appreciable disparity in evidence against these defendants and certainly not the dramatic difference required for severance.  Instead, their primary complaint appears to be that their co-defendants committed many more robberies than they did.  But this is not proper grounds for severance.  Indeed, absent an actual disparity in the evidence, courts are unwilling to sever based simply on a difference in the number of charges defendants face.  For example, in *United States v. Butler*, a defendant claimed prejudice because "he was named in only 4 of the 17 counts and in only 8 of the 49 overt acts alleged to be in furtherance of the conspiracy."  822 F.2d 1191, 1194 (D.C. Cir. 1987). The Circuit denied these claims because there was "no less involvement by [this defendant] than by any of the other[s] . . . charged in the indictment."  The difference in counts simply reflected that some defendants "roles in the conspiracy were somewhat broader."  *Id.*; *c.f.*, *United States v. Mardian,* 546 F.2d 973 (D.C. Cir. 1976) (finding severance appropriate where a defendant was only charged in a single conspiracy count and where the evidence against the defendant was meager).  The disparity in the number of charges here is based on the defendants' different roles in this conspiracy.  Defendants Mitchell and Gause played leadership roles, recruiting others to assist them in the robbery of pharmacies and cellphone stores. It should be no surprise that they face far more charges while those they recruited face less.

Ultimately, this Court can deal with any disparities with appropriate instructions. "Instructions to the jury to consider the evidence separately against each defendant, such as were given in this case, provide significant safeguards against the dangers of prejudice. *Butler*, 822 F.2d at 1194. The charged offenses were all committed on different days, at different locations, and will involve testimony from different victims. Given that, a jury will be able to compartmentalize the evidence by offense. There is simply "no compelling reason why a jury instruction would be insufficient to ensure that the jury compartmentalizes the evidence against [one defendant] from the evidence against [another]." *United States v. Williams*, 507 F.Supp.3d 181, 196 (D.D.C. 2020).

### b. The Fact That Some Defendants Are Charged with Firearm Offenses Does Not Justify Severance.

Defendant Dolford additionally claims that because some defendants are charged with firearm-related offenses and he is not, he will be prejudiced at trial. *See* ECF No. 122 at 3 (Dolford). But this purported prejudice is no more compelling than complaints regarding a disparate number of charges. It is true that Defendant Dolford is not charged with a firearms offense. Nonetheless, the facts underlying the robberies in which Dolford is charged are notably violent. During the Nottingham, Maryland robbery (Count 4), Dolford (identified by his distinctive sweatshirt) threw an employee to the ground, repeatedly punched him in the back of the head, and continued to hold him on the ground. During the College Park, Mayrland robbery (Count 5), in which Dolford is charged, the suspects threatened to kill a store employee. The employee believed that at least one suspect was armed with a gun. Given these facts, there is not much disparity in the violence with which Dolford is charged and the use of firearms by the other defendants in other robberies. Further, "[t]he mere presence of allegations of violent crime does not inexorably require severance of those defendants not charged directly with violent crime."

*United States v. Eiland*, 406 F. Supp. 2d 46, 53 (D.D.C. 2005).  Instead, as with a disparity in evidence, "[d]isparity as to the violence alleged is generally only dispositive when it is combined with another factor, such as drastic differences in those charges." *Id.*  Given the allegations of violence against Dolford and his co-conspirators, it seems unlikely that the jury would be particularly inflamed by the discussion of firearms in other robberies in which Dolford is not charged.  And any potential prejudice can be readily managed by the Court with an appropriate instruction.

### c.  Any Severed Counts Would Be Mutually Admissible Under 404(b).

Rule 404(b) allows the admission of "[e]vidence of any other crime, wrong, or act" for one or more non-propensity purposes, including, but not limited to, "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b); *see United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) ("[U]nder Rule 404(b), any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.").  "Rule 404(b) is a rule of inclusion rather than exclusion, and it is quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." *United States v. Long*, 328 F.3d 655, 660–62 (D.C. Cir. 2003) (quotation and citation omitted).  Moreover, "[w]hen Rule 404(b) evidence is central to the prosecution's case it should not lightly be excluded." *United States v. Troya*, 733 F.3d 1125, 1131-32 (11th Cir. 2013) (citations omitted); *accord United States v. Brown*, 597 F.3d 399, 407–08 (D.C. Cir. 2010) (rejecting argument that other-crimes evidence is unduly prejudicial where it accounts for "a large part of the government's case-in-chief").

Mutually admissibility, is a "highly significant factor" in assessing the propriety of severance, as any "prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials." *Drew v. United*

*States*, 331 F.2d 85, 90 & n.12 (D.C. Cir. 1964). Indeed, "[a] finding of prejudice is logically precluded if, had the counts been tried separately, the evidence concerning each count would have been admissible in the trial on each other count." *United States v. Levi*, 45 F.3d 453, 455 (D.C. Cir. 1995).

Given the number of defendants and charges, it is difficult to predict the exact combinations of charges and defendants in any severed trials. Any severed trials, however, would likely contain overlapping and mutually admissible evidence under Rule 404(b). Take for example, if Defendant Blount's motion to sever was granted, and Defendant Blount was tried alone with respect to Counts One through Five. The conspiracy charges against Blount could only be understand in light of the other participants in those two robberies, particularly Gause and Mitchell. The Government would be entitled to prove the purposes of the two conspiracies. Specifically, the Government would seek to admit evidence of Blount's intent in joining this conspiracy: to make money through the sale of stolen cellphones and narcotics through Gause's and Mitchell's connections. Evidence tending to demonstrate "intent, plan, preparation, and motive . . . is particularly probative where the government has alleged conspiracy." *United States v. Sampol*, 636 F.2d 621, 659 & n.23 (D.C. Cir. 1980) (citations omitted). "Other act evidence is admissible if specific intent is a statutory element of the offense," and "[c]onspiracy is a specific intent crime because the government must prove that the defendant had the specific intent to further the common unlawful objective of the conspiracy." *Hopper*, 436 Fed.Appx. at 421. Thus, in *Hopper*, the Sixth Circuit upheld the admission of evidence of other robberies under Rule 404(b) because those crimes showed the defendant and his co-conspirator's "common plan or goal to commit the offenses alleged in the indictment." *Id.*; *see also United States v. Abarca*, 61 F.4th 578, 581 (8th Cir. 2023) (other crimes evidence admissible to show defendant's "knowledge of drug trafficking and his intent to

participate in the alleged conspiracy"); *United States v. Ahaiwe*, No. 21-2491, 2023 WL 4196954, at *3 (2d Cir. June 27, 2023) (other crimes evidence admissible to show defendant's "intent to engage in and knowledge of the money laundering and bank fraud conspiracies").

Here, the Government would seek to illustrate the nature of the conspiracy that Blount joined by participating in these robberies, by detailing the other robberies orchestrated by Gause, Mitchell, and likely the other defendants. Such evidence would be admissible under 404(b) as they, among other things, illustrate Blount's intent. They would therefore be mutually admissible even in a severance trial, countenancing against severance. Given the overlapping nature of the charged conspiracies (and the overt acts supporting them) any severed trials would necessarily entail significant 404(b) evidence, rendering severance unnecessary.

## **CONCLUSION**

Ultimately, the two conspiracy charges in this case are properly joined as each defendant is charged in each conspiracy, and the conspiracy charges completely overlap. Further, defendants have demonstrated no grounds for severance. For all the foregoing reasons, the Government requests that the Court deny Defendants' motion to sever.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*/s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov